NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SCHWAB FOODS, INC., d/b/a
Mooresville IGA Foodliner,
Respondent.

No. 87–2510.

United States Court of Appeals,
Seventh Circuit.

Argued May 19, 1988.

Decided Oct. 6, 1988.

---

**9.** Accordingly, FLRA's cross-petition for enforcement of its order is denied.

Collis Suzanne Stocking, N.L.R.B., Washington, D.C., for petitioner.

Larry R. Downs, Kahn Dees Donovan & Kahn, Evansville, Ind., for respondent.

Before WOOD, Jr. and KANNE, Circuit Judges, and REYNOLDS, Senior District Judge.[*]

* The Honorable John W. Reynolds, Senior District Judge for the Eastern District of Wisconsin, is sitting by designation.

HARLINGTON WOOD, Jr., Circuit Judge.

This case is before us on application by the National Labor Relations Board (NLRB or Board) for enforcement of its order, issued July 17, 1987, against Schwab Foods, Inc., doing business as the Mooresville IGA Foodliner (the company). The order provided that the company shall cease and desist from restraining its employees from picketing or handbilling on its premises, assisting a company-sponsored alternative labor organization, and refusing to bargain collectively and in good faith with the union. The order required the company to affirmatively bargain in good faith with the union, withdraw recognition from the company-sponsored labor organization, and post a notice of employees' rights at its store. *Schwab Foods, Inc.*, 125 L.R.R.M. (BNA) 1225 (1987). The case originated more than ten years ago when complaints were issued on December 19, 1977, February 17, 1978, and March 31, 1978. These complaints were consolidated on May 31, 1978, and a hearing was held January 15–18, 1979. The administrative law judge rendered his decision September 28, 1979, and the case was brought before the Board on October 30, 1979. We grant the Board's application for enforcement.

## I. BACKGROUND

The company operates four grocery stores in Indiana. Two are in Martinsville, one is in Mooresville, and one is in Morgantown. This case is the third to arise from the efforts of some of the company's employees to exercise their right to union representation. In 1971, the Meat Cutters & Packinghouse Workers, Local 167 sought to organize the meat department employees at one of the Martinsville stores. In a decision and order issued in 1972, the Board found that the company had committed unfair labor practices in response to the employees' efforts to organize, and ordered it to bargain with the union based on the strength of the representation cards collected from a majority of the meat department employees. *Schwab's Foods, Inc.*, 197 N.L.R.B. 1068 (1972). In 1974, the Retail Clerks International Association, AFL–CIO began organizing employees at the company's Mooresville store. In 1976, the Board issued a decision and order finding that the company had again engaged in unfair labor practices. The Board issued a bargaining order based on the union's representation card majority and this court enforced the order. *Schwab Foods, Inc.*, 223 N.L.R.B. 394 (1976), *enforced*, 549 F.2d 805 (7th Cir.1977).

Three months after the Board issued its order in the second case, the company created a Store Representative-Management Conference Committee (committee) consisting of two representatives elected by employees at each of the company's four stores. The committee met once or twice a month and discussed various issues of concern to the company's employees. After each meeting, the company published and distributed to all employees a newsletter entitled "Crax and Fax" which included the minutes of the committee meetings. According to Crax and Fax, the committee's purpose was "to establish an effective means of communication between store employees and management ... create better working conditions ... discover new ideas, and knit together effective store teams." The newsletter printed articles critical of the union. The company maintained its relationship with the committee, which it advocated as a viable alternative to union representation.

On June 20, 1977, Retail Clerks International[1] Local President Charlie Mercer presented company attorney Arthur Donovan with the union's initial contract proposal. The first bargaining session was held on August 4, 1977. Between that date and June 5, 1978, the parties met nineteen times, exchanging written communications both at and away from the bargaining table. The negotiations did not result in a contract, although the parties agreed on

---

1. On June 7, 1979, the Retail Clerks International Union and the Amalgamated Meat Cutters and Butcher Workmen of North America signed a merger agreement to become a new entity known as the United Food and Commercial Workers International Union. The bargaining representative of the Mooresville IGA Foodliner employees is therefore no longer in existence.

some subjects, including lunch hours, funeral leave, jury duty, night shift premiums, grievance procedure, union steward, union representative access, display of the union store card, and seniority. The issues left unresolved included wages, no strike/no lockout, contract term, union security, and dues checkoff.

On December 1, 1977, after thirteen meetings, the union struck. The union picketed the company's Mooresville store, for which it held bargaining rights, and the company's other three stores in Martinsville and Morgantown. Negotiations continued during the strike with meetings held almost monthly until the union called off the strike on June 8, 1978.

Because the location of the picketing is an issue in this case, we describe it in some detail.

The Mooresville store covers 15,000 square feet and is located in the same building as a small drugstore. The two stores share a common site and are jointly responsible for building and parking lot maintenance, but are not commonly owned and do not advertise jointly. The company and the drugstore lease their shares of the building and parking lot from a third party. The two stores share a common entrance area, opening off of a twenty-by-twenty foot vestibule.

The parking area and the stores are separated by a canopied concrete walkway that abuts the vestibule. The company stores its extra shopping carts on the walkway and sells bulky seasonal merchandise from this area. The parking lot extends about 150 feet from the vestibule to the street. The lot has two entrances separated by a grassy strip.

On December 1, several pickets initially established a line near the parking lot entrances. Three pickets, including union representative Ed Stahl, later began to picket and handbill on the walkway near the vestibule. Soon after the pickets moved to the walkway, a company official told the pickets that they should not picket in front of the store. The pickets continued in place. Shortly thereafter, a police officer arrived and told Stahl that a complaint had been received from the drugstore, and the pickets should move to the front of the company store only. They complied with the request, but the company official again appeared and told them that if they did not leave, he would call the police. After a police car arrived, the pickets moved to the parking lot entrance. On February 17, a similar incident occurred, with picketing and handbilling in the walkway and vestibule of the store. Again, the company official threatened to have the pickets arrested unless they moved to the parking lot entrance.

The Martinsville store and its adjacent parking lot are owned by the company. The parking lot has an entrance on one street and an exit on another. On December 15, 1977, three union representatives and three striking employees picketed at the Martinsville store. The pickets initially established their line near the parking lot entrance and exit. Soon thereafter, the Chief of Police arrived and informed the picketers that they could not walk on city property, but that if they were peaceful, they could walk on the sidewalks. The nearest sidewalk was across the street from the company's property. The union and the city attorney entered into an agreement that day permitting the picketers to picket on an easement on the store's property.

Based on the foregoing facts, the Board found, in agreement with the administrative law judge, that the company violated sections 8(a)(1) and (2) of the National Labor Relations Act (the Act) by unlawfully assisting the committee. 29 U.S.C. § 158(a)(1), (2). The Board also found that the company violated sections 8(a)(1) and (5) of the Act by bargaining with the union without the requisite good faith and with no intention of entering into a final or binding collective bargaining agreement. 29 U.S.C. § 158(a)(1), (5). Finally, the Board found that the company violated section 8(a)(1) of the Act by threatening employees with arrest because of their picketing and handbilling although these activities were protected by section 7 of the Act, 29 U.S.C. § 157.

## II. DISCUSSION

### A. Issues

The company raises the following issues. It first argues that the Board applied an inappropriate test that failed to accommodate the company's private property rights as well as the picketers' section 7 rights. The company also argues that it bargained in good faith, as evidenced by its agreement with the union on most issues and the fact that it was able to withstand a strike. Third, the company argues that the remedial order is improper because of changed circumstances during the Board's eight-year delay in deciding the case and because the company lacked fair notice that the Board would rule on its "proclivity to violate the Act." [2]

### B. The Board's Finding Regarding the Picketers' Rights

The company argues that the Board did not correctly weigh the relative rights of the company and the picketers in deciding that the picketers' rights were more compelling than the employer's. It argues that the Board should have considered whether the picketers had available alternative means of communication.

Before we consider this argument, we note that "our review of NLRB decisions is limited with few exceptions." *Kankakee-Iroquois County Employers' Ass'n v. NLRB*, 825 F.2d 1091, 1093 (7th Cir.1987). The Board has the "special function of applying the general provisions of the Act to the complexities of industrial life." *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963). We must, however, consider the record as a whole to determine whether the Board's findings are supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *Richmond Recording Corp. v. NLRB*, 836 F.2d 289, 292 (7th Cir.1987). If the Board's findings do have substantial support in the record, "we should defer to reasonable Board con-

clusions." *UAW Local No. 1712 v. NLRB*, 732 F.2d 573, 577 (7th Cir.1984); *see also NLRB v. Burkart Foam, Inc.*, 848 F.2d 825, 829 (7th Cir.1988).

■ Sections 7 and 8(a)(1) of the Act guarantee employees the right to engage in union activity free from employer interference, restraint, or coercion. 29 U.S.C. §§ 157, 158(a)(1). Section 13 expressly protects employees' rights to engage in peaceful strike activity against employers. 29 U.S.C. § 163. *See also Division 1287, Amalgamated Ass'n of Street Employees v. Missouri*, 374 U.S. 74, 82, 83 S.Ct. 1657, 1662, 10 L.Ed.2d 763 (1963); *NLRB v. International Rice Milling Co.*, 341 U.S. 665, 672–73 & n. 8, 71 S.Ct. 961, 964–65 & n. 8, 95 L.Ed. 1277 (1951). These rights include the right to picket an employer. *NLRB v. Drivers Local Union No. 639*, 362 U.S. 274, 281 n. 9, 80 S.Ct. 706, 710 n. 9, 4 L.Ed.2d 710 (1960).

■ Where employees seek to exercise their statutory rights on private property from which their employer seeks to exclude them, the Board must reach an accommodation between the employees' section 7 rights and the employer's property rights " 'with as little destruction of one [right] as is consistent with the maintenance of the other.' " *Hudgens v. NLRB*, 424 U.S. 507, 522, 96 S.Ct. 1029, 1038, 47 L.Ed.2d 196 (1976) (quoting *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112, 76 S.Ct. 679, 684, 100 L.Ed. 975 (1956)) (footnote omitted). The Board has the primary responsibility for determining how best to accommodate the conflicting rights in the context of each dispute. *Hudgens*, 424 U.S. at 522, 96 S.Ct. at 1037.

The Board, in *Fairmont Hotel Co.*, 123 L.R.R.M. (BNA) 1257 (1986), reexamined its approach to these questions of accommodation between employees' and employers' rights, and announced a test that it believed would better comport with the Supreme Court decisions. The Board believed that it had been placing too much emphasis

2. The company apparently does not challenge the Board's finding that it violated sections 8(a)(1) and (2) of the Act by unlawfully assisting

the committee. We therefore express no opinion on that finding.

on the availability to striking employees of alternative means of communication at the expense of determining the nature and strength of the section 7 and private property rights in the context of disputes. The Board's new test provided as follows:

> If the property owner's claim is a strong one, while the Section 7 right at issue is clearly a less compelling one, the property right will prevail. If the property claim is a tenuous one, and the Section 7 right is clearly more compelling, then the Section 7 right will prevail. Only in those cases where the respective claims are relatively equal in strength will effective alternative means of communication become determinative.

*Id.* at 1260 (footnote omitted). The Board suggested that in evaluating employees' section 7 rights it would consider

> the nature of the right asserted, the purpose for which it is being asserted, the employer that is the target of the activity, the situs of the activity, the relationship of the situs to the target, the intended audience of the activity, and, possibly, the manner in which the right is being asserted.

*Id.* In determining the weight to give to an employer's property rights, the Board indicated it would consider several factors including "the use to which the property in question is put; the restrictions, if any, that are imposed on public access to the property or to the facility located on the property; and the size and location of the private facility." *Id.* at 1259–60.

The company argues that this test "ignores the fact that a reasonable alternative means of communication is most in accord with the Court's directive" in *Hudgens* that the Board should accommodate both parties' rights " 'with as little destruction of one as is consistent with the maintenance of the other.' " *Hudgens,* 424 U.S. at 522, 96 S.Ct. at 1038 (quoting *Babcock,* 351 U.S. at 112, 76 S.Ct. at 684). According to the company, the *Fairmont* test allows a union to choose the most effective place of communication, even if it means that employees would be picketing inside the work site. This argument implies that the Board has

no choice but to rubber-stamp the union's activities. If the argument were true, one would expect that the employees' section 7 rights would always prevail. As the company itself notes, however, this is not the case. In the *Fairmont* case, for example, the Board found that the employer had a "valid interest" in minimizing congestion, although the hotel merely believed that pickets would cause congestion and had not proved any impediment. 123 L.R.R.M. (BNA) at 1260. In another case, *Greyhound Lines, Inc.,* the Board found that an employer restaurant did not violate the Act when it had pickets removed from the lobby in the bus terminal in which the restaurant was located. The Board noted that the union's section 7 rights were not more compelling than the employer's property rights. 125 L.R.R.M. (BNA) 1266, 1267–68 (1987). Clearly, the Board is able to weigh the employees' and employers' competing interests in reaching an accommodation of both.

■ In regards to the Mooresville store, the Board, considering the nature of the company's property interest, found that its interest was diluted by the fact that it shared its leased premises with the neighboring drugstore. The Board also found that access to the premises was not restricted; the general public was invited to patronize the store, and the walkway and vestibule were "open to virtually anyone." According to the Board, the employees' picketing activities did not impede customers seeking access to either store. Therefore, the Board found that the employer's property claim with respect to the Mooresville store was relatively weak.

As regards the Martinsville store, the Board found that the company owns the store and parking lot, and is the only business at that location. The employees, however, rather than picket near the store building, had stationed themselves near the entrance and exit to the parking lot. The Board found that the company placed no restrictions on public access to the store, the pickets were far from the store entrance, and there was no evidence of safety or other problems arising from the picket-

ers' activities. Therefore, although the Board found that the company had a stronger property interest in its Martinsville store than it would have had if the store had been located in a shared mall area, it still found that the company's property interest in the parking lot was relatively limited.

By contrast, the Board found that the employees' rights to engage in peaceful, lawful picketing activity to support their strike in Mooresville were compelling, and their rights were not substantially diminished when they sought to assert them at the company's store in Martinsville. The Board took into account the employees' intended audience, nonstriking employees as well as suppliers and customers of the company, in finding that the employees' section 7 rights outweighed the company's property rights. This finding is substantially supported by the record evidence.

The company argues that even if the *Fairmont* test itself is legal, it has been applied in an arbitrary and capricious manner. We disagree. As we have demonstrated, the Board considered various factors in reaching its decision that the employees' rights were paramount over the company's rights. The company points out several cases that, it believes, prove that the Board applied *Fairmont* differently in this case than it has in others. *40–41 Realty Assocs., Inc.*, 288 N.L.R.B. No. 23 (1988); *Browning's Foodland, Inc.*, 125 L.R.R.M. (BNA) 1264 (1987); *Fairmont Hotel Co.*, 123 L.R.R.M. (BNA) 1257 (1986); *Greyhound Lines, Inc.*, 125 L.R.R.M. (BNA) 1266 (1987). These cases are all distinguishable, however.

In *40–41 Realty Assocs.*, the picketers, like the picketers in this case, included employees of the target employer who were engaged in an economic strike. The Board found that the section 7 interests of the picketers were compelling. The Board also found, however, that the property interests of the employer were also compelling. The

employer was a dental facility and its office was located on the second floor of a twenty-story office building. The corridor where the picketing took place, while not barred to the general public, was commonly used only by patients, employees, and suppliers of the dental facility. The Board found that the employer's strong property interest in the small corridor was equivalent in weight to the union's section 7 interests. The Board thus went on to consider the availability of alternative means of communication and found that the union had other, reasonable means of conveying its message. The employer in the present case did not retain such a strong property interest in its premises, which were open to the public in general. The employees' rights outweigh the employer's property rights.

Similarly, in *Browning's Foodland*, the Board weighed the union's section 7 rights against the employer's property rights and found the union's and employer's rights to be relatively equal. Although the employer's rights were not particularly compelling, neither were the union's: none of the picketers or handbillers worked for the employer. The Board then considered the adequacy of the alternative means of communication, finding that the picketing and handbilling conducted by nonemployees of the target employer for the purpose of conveying information to potential customers was lawfully banned from a shopping mall. The Board found that the union could reach all potential customers with reasonable effectiveness from nearby public property. In this case, by contrast, the Board found that the rights of the picketers, many of whom were employees of the company, outweighed those of the employer. The Board therefore did not have to reach the question of the availability of alternative means of communication.[3]

In *Fairmont*, the Board found that the Fairmont Hotel was not required to permit picketing in its lobby to publicize an area-standards dispute with a bakery that sup-

---

3. One of the Board members, however, did consider the availability of reasonable alternative means of communication as a factor in the initial determination of the relative strength of the employees' rights. He found that the balance tipped decidedly in favor of the employees' right to picket.

plied the hotel's restaurant with bread. The pickets did not represent employees of either the hotel or the bakery and, therefore, the union had no particular link to the employees on the hotel property. The hotel's property rights thus outweighed the union's section 7 rights. In this case, as we have noted, many of the pickets were striking employees of the company, whose rights are more compelling than those of nonemployee pickets.

The *Greyhound Lines* case is similar to the *Browning's Foodland* case. As it did in *Browning's Foodland*, the Board found that the union's rights and the employer's rights were relatively equal. In picketing at the entrance to the restaurant, the union was conducting its activities entirely on the neutral bus company's property, on a particularly busy holiday weekend. The union's interest was diminished by the fact that it was not asserting its own section 7 rights and the fact that it was asserting those rights on the property of someone other than the target employer. The bus terminal's interest in excluding the union was strengthened by the increased congestion of a holiday weekend. Accordingly the Board went on to consider the availability of alternative means of communication and found that the pickets could have reached their intended audience, the restaurant's customers, rather than its employees, by picketing at the entrances to the bus terminal. It was not necessary that the union picket within the terminal at the entrance to the restaurant itself. In this case, many of the pickets were employees of the company, the picketing took place, for the most part, on the company's property, and there was no evidence of any particular congestion.

We see no inconsistency with the Board's application of the *Fairmont* test in this case as compared to the cases the company has cited to us. We find the Board's decision on this point to be well-reasoned. We will not deny the Board's petition for enforcement on this ground.

## C. Good Faith Bargaining

In its opinion, the Board majority found that the company had "demonstrated an intent to avoid any agreement with the Union." According to the Board, the company demonstrated its lack of good faith by rigidly adhering to its proposals and using "take-it-or-leave-it bargaining tactics." The Board also found objectionable the company's unlawful dealings with the committee. As in *NLRB v. Advertisers Mfg. Co.*, it seems that "[f]or the most part the company is merely disagreeing with the Board's evaluation of conflicting evidence and exercise of remedial discretion; the futility of such challenges requires no comment." 823 F.2d 1086, 1087–88 (7th Cir. 1987). We will nevertheless consider the company's arguments.

■ The determination of whether a party has bargained in good faith must be based upon the totality of the circumstances. *UAW Local No. 1712 v. NLRB*, 732 F.2d 573, 578–79 (7th Cir.1984). Isolated instances of misconduct will not be viewed as a failure to bargain in good faith. *Id.*

■ In finding that the company refused to bargain in good faith, the Board relied primarily on the issue of wages and the company's dealings with the committee. Our consideration of these issues persuades us that the Board's conclusions finds substantial support in the record.

On May 9, 1977, before the parties commenced bargaining, the company gave notice of its intent to implement a wage increase at all of its stores, retroactive to May 1. The union consented to the inclusion of the Mooresville store employees in the wage increase. During negotiations, the company continued to rely on this tactic by presenting wage proposals to the union under threat of immediate implementation at all stores, with the proviso that the company would accede to the union's desire to withhold implementation of the increase at the Mooresville store represented by the union. The company made these proposals on November 11 and December 29, 1977, and April 28, 1978. The wage increases were immediately implemented at the three nonunion stores and, after some delay, unilaterally imposed nonretroactively at the Mooresville store.

These actions created a wage disparity between the company's represented and nonrepresented employees. The wage terms the company offered the union were based essentially on past practice and federal minimum wage laws and did not differ from the wage terms the employees would have received had there been no union representation. The Board agreed with the administrative law judge that

"[a]side from the terms of the [wage] offers, [the company's] tactic of confronting the Union with them on an eleventh hour basis, with the characterization of 'last offer,' under self-serving declarations of impasse, and threats of implementation, was calculated to remove effectively from bargaining the wage issue. The Union was forced to either accept implementation, and thereby to acknowledge [the company's] right to unilaterally determine wage rates on a take it or leave it basis, or to accept the consequences of full or partial implementation. Indeed, [the company's] action, in having implemented its last minute December offer at the nonunion stores, and thereafter steadfastly opposing full retroactivity at Mooresville with respect to the very benefits grant [sic] elsewhere, strongly suggested an intent to subvert bargaining to ends inimical to statutory obligations."

*Schwab Foods, Inc.*, 125 L.R.R.M. (BNA) 1225, 1226 (1987) (quoting administrative law judge's opinion). The company's tactics with regard to wage increases left the bargaining unit employees at an unquestionable disadvantage in relation to the nonunion employees.

The company's statements provide support for the finding that it did not engage in good faith bargaining. On December 29, 1977, the company told the union that if the union did not approve implementation of the wage increase for January 1, 1978, "there would have to be some explanation to the employees as to why the raise was not given." On May 13, 1978, the company's attorney wrote to the union commenting unfavorably on the union's insistence that the Mooresville employees be paid less than the company's other employees, and

stating that "it just doesn't seem fair that the employees should be involved in the strategy of bargaining." This discrepancy would have been remediable had the company not refused to apply its January 1 wage increase retroactively to the Mooresville employees. The Board correctly believed that, when viewed in the context of the parties' bargaining, the company's approach to the wage issue showed evidence of a lack of good faith.

The Board also found that the company's dealings with the committee as if it were the authorized representative of its employees was another factor indicating that the company was not negotiating in good faith. *See, e.g., NLRB v. Generac Corp.*, 354 F.2d 625, 628 (7th Cir.1965) (an employer manifests a lack of good faith when it engages in acts calculated to undermine a union's status as exclusive bargaining representative). An example of the company's differing conduct toward the committee and the union is its treatment of requests from both groups for a payroll checkoff. The union requested a payroll checkoff for the payment of union dues. The company refused, citing the increased administrative inconvenience of adding the checkoff to its bookkeeping procedures. At the same time, however, Crax and Fax reported that the company had responded favorably to the committee's request for a checkoff provision for employee contributions to a nonunion credit union. We agree that the Company's relationship with the committee was a factor that supported the Board's finding that the company failed to bargain in good faith.

## D. Propriety of the Board's Remedial Order

The company argues that the Board's remedial order is improper and should not be enforced because of changed circumstances in the years elapsed since the complaints were filed and because the complaint did not adequately inform the company of the issue to be tried. The Board premised its cease and desist order on its finding that, in light of the company's "history of unlawful conduct," the company

had "demonstrated a proclivity to violate the Act and unlawfully frustrate the organizational desires of its employees." The company complains that it lacked fair notice of the issue because the complaint did not expressly charge that the company had a "proclivity to violate the Act."

The company's complaint pertains to the relief ordered in this case. The administrative law judge had issued a narrow order which the Board had modified to a broad order in its decision, based on the company's proclivity to violate the Act. It is well-settled that, while General Counsel's complaint must give a respondent fair notice of the violations charged, "[i]t is unnecessary for the complaint to spell out the details of the relief to be requested if it is found that the Act has been violated." *NLRB v. Winchester Elecs., Inc.*, 295 F.2d 288, 292 (2d Cir.1961); *accord NLRB v. Union Nacional de Trabajadores*, 540 F.2d 1, 11 n. 9 (1st Cir.1976) (rejecting union's contention "that the broad orders were unlawful because the General Counsel did not give [the union] notice that he would seek broad orders"), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977).

■ The company's proclivity to violate the Act to its employees' detriment is demonstrated by the evidence of its violations in this case as well as in the two prior cases: *Schwab's Foods, Inc.*, 197 N.L.R.B. 1068 (1972), and *Schwab Foods, Inc.*, 223 N.L.R.B. 394 (1976), *enforced*, 549 F.2d 805 (7th Cir.1977). Moreover, the company received express notification that its proclivity to violate the Act was at issue in this case when the General Counsel, in exceptions to the administrative law judge's decision, requested issuance of a broad cease and desist order based on this company's demonstrated proclivity. The company could have challenged this request under the Board's rules. It did not do so. We find that the company waived this due process claim because of its failure to bring a timely objection to the lack of prior notice. The company was aware that proclivity would be an issue before the Board, but it did not object. "The due process clause ... is not violated by requiring a party to

raise a defense based on lack of proper notice within a reasonable period after he becomes aware of the procedural default." *NLRB v. Western Temporary Servs., Inc.*, 821 F.2d 1258, 1264 (7th Cir.1987). This claim comes too late.

■ Similarly, we find that the company has waived its objections to the Board's remedial order based on changed circumstances, specifically, that the union allegedly ceased to exist after a merger in June 1979 and that there has been a substantial employee turnover since the complaints were filed. Although the merger occurred while the Board's decision was pending, the company did not file any motions with the Board asking it to consider this changed circumstance. The Act provides that "[n]o objection that has not been urged before the Board ... shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). This raises a jurisdictional bar against review of issues not raised to the Board. *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66, 102 S.Ct. 2071, 2082–83, 72 L.Ed.2d 398 (1982). When the Board's order issued, the company did not ask the Board to reconsider its order in light of the changed circumstances. The company does not suggest to us what "extraordinary circumstances" prevented it from doing so. We therefore find that the company has waived its right to object to the terms of the Board's order at this stage of the proceeding. *See International Ladies' Garment Workers' Union v. Quality Mfg. Co.*, 420 U.S. 276, 281 n. 3, 95 S.Ct. 972, 975 n. 3, 43 L.Ed.2d 189 (1975) (if not raised earlier, objection must be asserted through motion for reconsideration, rehearing or reopening of the record).

## III. CONCLUSION

We find that the Board's decision was supported by substantial evidence in the record. We therefore grant the Board's application for enforcement in full.

ENFORCED.