920 F.2d 933
 136 L.R.R.M. (BNA) 2064
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
STANDARD ROOFING CO., Respondent.
 No. 89-6402.
 United States Court of Appeals, Sixth Circuit.
 Dec. 18, 1990.
 
 Before MILBURN, BOGGS and SUHRHEINRICH, Circuit Judges.
 PER CURIAM.
 
 
 1
 The National Labor Relations Board ("Board") petitions to enforce its order requiring Standard Roofing Co. ("Standard") to enter into and adhere to a collective bargaining agreement signed on August 19, 1985 between the Greater Cleveland Roofing Contractors Association, Inc. ("Association") and the United Union of Roofers, Waterproofers and Allied Workers, Local Union No. 44, AFL-CIO ("Union"), and to apply the agreement retroactively to May 1, 1985. The order remedies a violation by Standard Roofing of Secs. 8(a)(1) & (5) of the Labor Management Relations Act (the "Act"), 29 U.S.C. Secs. 141-187, for refusal to bargain with a recognized union. Because we find that substantial evidence supports the Board's order, we will enforce it.
 
 
 2
 * This case arises out of negotiations in 1985 for a new labor contract between the Association and the Union. The Association is a multi-employer bargaining group permitted by the National Labor Relations Act to engage in collective bargaining with the Union on behalf of all its member employers. Standard Roofing was a member of the Association when bargaining commenced for the contract signed in 1985 between the Association and the Union.
 
 
 3
 The Association did not represent all Cleveland area roofing contractors. Several contractors had withdrawn from the Association before mid-December 1984. These contractors ("independent contractors") controlled a substantial share of the Cleveland area union-contracted roofing market. Two of the independent contractors, Weathermark and Industrial First, controlled 30-35% of the market between them.
 
 
 4
 The old agreement between the Association and the Union was scheduled to expire on April 30, 1985 if one of the parties expressed an intent to discontinue the agreement by January 1, 1985. The Union mailed a letter on December 26, 1984 to every contractor who had been a member of the Association in the previous round of contracting, stating its intention to discontinue the current bargaining agreement. The letter was not mailed to the Association itself.
 
 
 5
 Bargaining between the Association and the Union commenced on March 5, 1985. At that time the Union asked the Association for a list of its membership. The Association presented a list of proposals for terms in a new bargaining agreement, while the Union presented no proposals at this meeting. The Union stated it would submit proposals after it met with its membership. The Union's chief negotiator, Mike Branca, testified that the Union probably did not present proposals at this meeting because he had been hospitalized for January and most of February. The Union stated that it would be simultaneously negotiating with the independent contractors.
 
 
 6
 Included among the Association's proposals was a request that certain "pre-apprentices," or "helpers," be permitted to staff roofing jobs. These helpers would work for a lower rate of pay than did Union workers. The Association stated that it offered this proposal in order to decrease its construction costs so it could compete with the non-union contractors. These non-union contractors allegedly were gaining market share in the Cleveland area roofing market.
 
 
 7
 Historically, the Association and the Union presented their proposals in this first bargaining session, promising not to revise their list of proposals after the second session. There is no testimony regarding whether this practice was reaffirmed for this bargaining session.
 
 
 8
 The Union mailed out a letter to all contractors, including members of the Association, asking the contractors individually to sign a draft interim agreement. Interim agreements permit work to continue during periods where no agreement is operating. Branca testified that this letter was mailed to the Association contractors in error. The Union never attempted to contact the Association contractors by phone or in person to persuade or entice them to sign an interim agreement.
 
 
 9
 The next bargaining session took place on April 1. The Union presented a list of sixteen proposals, none of which was ultimately included in the final agreement. Branca testified that some of the proposals were dropped once "serious negotiations" began. The two parties disagreed on the Association's helper proposal, and the union offered no counter-proposal.
 
 
 10
 The next bargaining session took place on April 17. The Union proposed a "targeted jobs" program in place of the Association's proposal of unrestricted use of helpers. The Union's proposal permitted the use of helpers only when absolutely necessary to compete with non-union contractors. The Union did not present this idea in writing. The Association rejected the idea as unworkable. The Union said it was unable to tell the Association what its "bottom line" was because it needed to hold a meeting with its membership.
 
 
 11
 The parties next met on April 22. The Association continued to press for resolution of the helper issue, arguing that the alternatives were either increased use of helpers or lower pay for Union workers. The Union rejected reducing the pay for their members, so discussion turned once more to the helper issue. The Union promised to provide a written proposal on helpers.
 
 
 12
 The April 27 bargaining session showed little change. The Association changed its helper demand, reducing the percentage of each construction project that could be staffed with helpers from 100% to 33 1/3%. The Union rejected these proposals as putting its members out of work. The Union did not present a written counter-proposal.
 
 
 13
 The parties met again on April 30, the day the agreement was set to expire. The Union presented a counter-proposal that helpers could be used only when no Union members were available, and limiting the helpers pay to 40% that of the Union members. The Union also proposed a three-year contract with different wage rates for each year. The Association objected that submission of these proposals on the last day violated the ground rules, and also raised its members' costs.
 
 
 14
 The Association then presented the Union with its "final offer." This offer included a provision permitting the unlimited use of helpers up to 33 1/3% of the job staffing. The Association also proposed a two-year contract with a wage freeze during both years. The Union then proposed that the Association eliminate the requirement that the use of helpers be unlimited, proposing instead that helpers could only be utilized in accordance with the procedure in the existing agreement. The existing agreement required Union members to be assigned to jobs according to their class within the Union, with members in certain classes being permitted to work before members in other classes. The Association rejected that proposal.
 
 
 15
 The Union then requested a federal mediator, but rejected the idea that the parties were at an impasse. The Union also agreed to put the Association's offer to a vote of the membership. The membership rejected the Association's offer on May 5 or 6.
 
 
 16
 The parties met again without federal mediation on May 10. The Union offered a counter-proposal on the helper issue, permitting helpers to comprise 40% of the project staff as long as all members of a class called "journeymen" were employed. Other provisions were offered by the Union regarding the salary of helpers and the power to decide the projects on which helpers could be used. The Union also proposed a two-year contract with a two-year wage freeze. The Association rejected the proposals as being too costly. The Union repeated a request for a federal mediator.
 
 
 17
 A bargaining session was held with a Federal mediator on May 23. Neither side altered its position, and no agreement was reached. The final bargaining session prior to the dissolution of the Association was held on June 19. The Union provided a proposal regarding the helper issue that was then under negotiation with the independent contractors. The proposal included a portion that had been stricken by hand, providing a 50% ratio of helpers to journeymen for each job. The Union refused an Association request to reinstate and negotiate over the stricken clause.
 
 
 18
 The Association voted to disband after this session. The Association's chief negotiator, Robert Lally, testified that the Association voted to disband because continued negotiations were futile. The Association notified the Union of its dissolution on June 24. The Union rejected this dissolution as untimely withdrawal, and demanded to continue bargaining with the Association.
 
 
 19
 Standard Roofing sent a letter to the Union on July 1 requesting individual bargaining. This request was rejected by the Union.
 
 
 20
 The Union signed a new agreement with Industrial First and Weathermark on August 1. The Association, Standard Roofing dissenting, voted to reform its multi-employer bargaining committee on August 13. On August 15, Lally went to the Union's office to sign the Weathermark accord on behalf of the reformed Association. The Union and the Association differ as to the events of the meeting. The Association said it attempted to bargain, but was told the Union would not bargain, as it wanted a single industry-wide agreement. The Union does not mention whether the Association attempted to bargain, saying merely that Lally arrived to sign the agreement. The Association eventually signed the agreement on August 19.
 
 
 21
 Branca contradicted himself in his testimony regarding this meeting. He first stated that he was not aware that Standard Roofing was not part of the new Association, but he later testified that he had personally received a letter from the President of Standard Roofing to that effect before the meeting with Lally.
 
 
 22
 The Union, on August 27, mailed a letter to Standard Roofing expressly stating that the Union refused to bargain with Standard Roofing, and that the Union believed Standard was bound by the terms of the agreement reached with the Association.
 
 II
 
 23
 * This case began when the Board decided to charge Standard Roofing with a violation of Secs. 8(a)(1) & (5) of the Act by illegally withdrawing from a valid multi-employer bargaining group during negotiations. The withdrawal allegedly occurred when the Association voted to disband itself on June 19. The Administrative Law Judge (ALJ) found that the Association's disbanding did violate the Act, and that Standard was thus in violation of the Act because it was a member of the Association. The ALJ ordered that the violation be remedied by Standard entering into and adhering to the agreement reached between the Union and the Association on August 19, and applying it retroactively to May 1, 1985. Standard appealed the decision of the ALJ to the Board, and the Board upheld the ALJ's decision and his remedy. This enforcement action followed.
 
 
 24
 Standard raises five issues before this court in opposition to the enforcement of the Board's order. Three of these issues contend that the entire order is unenforceable because it contrary to law. Two of the issues seek to amend the order. We first examine the arguments challenging the order's validity.
 
 
 25
 We begin by observing that we must uphold the NLRB's findings of fact and its application of law to the facts in determining when a violation of the Act occurs provided that "substantial evidence" exists in the record as a whole to support the Board's finding. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951); Litton Microwave Cooking Products Div., Litton Systems Inc. v. N.L.R.B., 868 F.2d 854 (6th Cir.1989). We must uphold the Board's findings and holdings even if we would have reached a different result had we been the trier in the instance. N.L.R.B. v. United States Postal Service, 841 F.2d 141, 144 (6th Cir.1988). Accord, N.L.R.B. v. Herman Sausage Co., 275 F.2d 229 (2nd Cir.1960).
 
 B
 
 26
 The National Labor Relations Act permits employers to band together in one group for collective bargaining purposes. Such groups are called "multi-employer bargaining groups," and each member of the group is required to sign and adhere to any agreement reached by the group with the union while it is a member of the group. See N.L.R.B. v. Watson-Rummell, Co., 815 F.2d 29, 31 (6th Cir.1987).
 
 
 27
 Members of a multi-employer bargaining group may freely withdraw from it, and thereby not be bound by any agreement it reaches, at any time before bargaining has commenced. Once bargaining has commenced, however, the Board has held that no member of such a group may withdraw absent the consent of both the union and the group, or the existence of "unusual circumstances." Retail Associates, 120 N.L.R.B. 388, 393-95 (1958). This rule was cited with approval by the Supreme Court in Charles D. Bonanno Linen Service, Inc. v. N.L.R.B., 454 U.S. 404, 410-11, (1982). We adopted the Retail Associates rule in Tennessee Products and Chemical Corp. v. N.L.R.B., 423 F.2d 169, 178 (6th Cir.), cert. denied, 400 U.S. 822 (1970). See, e.g., Carpenters Local Union v. W.D. George Construction Co., 792 F.2d 64, 69 (6th Cir.1986). The Board has held that an untimely withdrawal constitutes a violation of Secs. 8(a)(1) & (5) of the Act. Polar Air Sheet Metal Company, 264 N.L.R.B. 1331 (1982). The Board has further narrowly construed the phrase "unusual circumstances," limiting it mainly to cases where the union has fragmented the group and thereby eliminated its viability, and cases where the employer would face dire economic prospects, such as immediate bankruptcy, were it to adhere to the signed agreement. N.L.R.B. v. Hartman, 774 F.2d 1376, 1386 (9th Cir.1985). See also Bonanno, 454 U.S. 404, 411 n. 6 (narrow construction of "unusual circumstances" noted as prevalent law).
 
 
 28
 The ALJ found that the dissolution of the Association was not precipitated by "unusual circumstances" and was not consented to by the Union. Standard disagrees with both contentions, and bases its first argument upon its disagreement.
 
 
 29
 Standard's first argument has four separate parts. First, Standard Roofing contends that the Union constructively consented to the disbanding and Standard Roofing's withdrawal from the group. Second, it contends that the disbanding was precipitated by the "unusual circumstance" of the union attempting to fragment the group and destroy its viability. Third, Standard contends that the dissolution was precipitated by the Union's failure to bargain in good faith as required by Secs. 8(b)(1) & (3) of the Act. Finally, Standard contends that the Retail Associates rule permits sincere and permanent withdrawals. We will deal with each point in order.
 
 
 30
 Standard alleges that the Union consented to the dissolution of the Association because it mailed the initial termination letter to the individual Association members on December 26, and mailed a request to sign an interim agreement to them on March 25. Standard alleges that these mailings constituted a request to bargain individually with the members of the Association, and that the Union thus consented to the subsequent dissolution.
 
 
 31
 The Board's finding that the Union did not constructively consent to the dissolution of the Association is well supported by the record. The Union expressly refused to accept the dissolution of the Association. The Union continued to demand to bargain with the Association in the time between its notification of the dissolution of the Association on June 24 and the reformation of the Association on August 13. Finally, when Standard Roofing attempted to bargain with the Union individually, the Union rebuffed its efforts and stated in its letter of August 27 that it considered Standard to be part of the Association. Since the Board has recognized a constructive consent claim only when a union undertakes a course of affirmative action "clearly antithetical" to the union's claim that the employer has not withdrawn from multi-employer bargaining, I.C. Refrigeration Services, 200 N.L.R.B. 687, 689 (1972) (simultaneous negotiation with both a multi-employer group and withdrawn members is constructive consent to the withdrawal), it is clear that Standard's first argument is without merit.
 
 
 32
 Standard also relies on the above letters as evidence supporting its argument that the Union attempted to fragment the Association. Standard argues that the letters were an attempt to coerce the individual members of the Association into abandoning it, thereby violating the Act's command that an employer must be allowed to choose freely its bargaining representative. International Brotherhood of Electrical Workers v. N.L.R.B., 487 F.2d 1143, 1152 (D.C.Cir.1973), cert. denied, 418 U.S. 904 (1973); General Electric Company v. N.L.R.B., 412 F.2d 512, 516-17 (2d Cir.1969). The letter of March 25, which asked the members to sign an interim agreement, is particularly egregious, according to Standard. Standard relies on Local Union No. 103, International Association of Bridge, Structural and Ornamental Ironworkers AFL-CIO and its agent Charles Tremper, 195 N.L.R.B. 980, enforced sub nom. N.L.R.B. v. Iron Workers, 69 Labor Cases (CCH) Para. 13,169 (7th Cir.1972) and Joseph J. Callier d/b/a Callier's Custom Kitchens, 243 N.L.R.B. 1114 (1979), enforced in part N.L.R.B. v. Callier, 630 F.2d 595 (8th Cir.1980) for its argument. Standard contends that Local 103 stands for the proposition that a valid bargaining impasse must exist before a union can negotiate individual interim agreements, and, since no such impasse existed when the letters were mailed, the Union is thereby in violation of the Act. Standard also contends that Callier stands for the proposition that interim agreements must pass a four-part test before they will be held not to cause fragmentation. Since the interim agreement of March 25 did not meet this test because it did not refer to the ongoing multi-employer negotiations and would have bound the member to any collective bargaining agreement, even if the agreement were reached only with the independent contractors, Standard contends that the Association was fragmented and thereby the dissolution was permissible.
 
 
 33
 We reject Standard's argument because its reliance on Callier and Local 103 is misplaced, and because substantial evidence exists to support the Board's interpretation that the mailing of the letters did not fragment the Association. Local 103 held that the actual signing of interim agreements without the existence of a valid impasse fractured the group. Here, no member even responded to the union's letter. Callier also does not support Standard's contention because the court in Callier did not purport to establish a test governing the validity of interim agreements. Rather, the court merely examined the interim agreement in light of the principle that the agreements must not have the effect of reducing the employers' commitment to the multi-employer group. In light of the fact that no member of the Association even attempted to sign the interim agreements as mailed, it is certain that the members' commitment to the Association was not lessened as a result of the union's actions.
 
 
 34
 We also hold that substantial evidence supports the Board's finding that the Union did not even attempt to fragment the Association by mailing the letters. Branca testified that the December 26 letter was mailed to all prior members of the Association because it wanted to know which companies were still a part of the Association since some employers had recently left the Association, and it wanted all of the members to be aware of the onset of the new bargaining round. The Board correctly noted that there is no evidence that the Union followed up these letters with attempts to contact the members and attempt to persuade them to leave the group.
 
 
 35
 The NLRB also found that the mailing of the March 25 letter was due to a clerical error. Branca testified that he was not even aware of the error until an investigator for the NLRB took his deposition several months later. Again, the Union did not follow up this letter with any attempts to contact the members of the Association and persuade them to leave the group. Since Standard produced no evidence refuting the testimony regarding either letter, we are satisfied that the Board's finding is well supported.
 
 
 36
 Standard's third contention is that the Union did not bargain in good faith, thereby justifying its untimely withdrawal. Standard relies on Connell Typesetting Company, 212 N.L.R.B. 918, 921 (1974) for the proposition that bad faith bargaining is an "unusual circumstance" justifying an untimely withdrawal. Connell does not stand for this proposition. Rather, it stands for the proposition that the procurement of employer withdrawals from a multi-employer bargaining group and the signing of separate agreements with the withdrawn members constitutes illegal fragmentation of the group. Notwithstanding, the Board specifically found that the Union did not bargain in bad faith.
 
 
 37
 The Act requires each party to bargain with the sincere intention to reach an agreement. N.L.R.B. v. Insurance Agents' Int'l Union, 361 U.S. 477, 486 (1960); N.L.R.B. v. Herman Sausage Co., 275 F.2d 229 (5th Cir.1960). The determination of whether a party has bargained in good faith must be made by examining the totality of the circumstances. N.L.R.B. v. Schwab Foods, Inc., 858 F.2d 1285, 1292 (7th Cir.1988). The duty to bargain in good faith does not "compel either party to agree to a proposal or require the making of a concession...." N.L.R.B. v. American Insurance Co., 343 U.S. 395, 402 (1952); Pease Co. v. N.L.R.B., 666 F.2d 1044, 1049 (6th Cir.1981), cert. denied, 456 U.S. 974 (1982). We have held previously that the refusal of one party to agree to another party's approach to a key issue does not create a case of bad faith bargaining. N.L.R.B. v. United Clay Mines, 219 F.2d 120, 125 (6th Cir.1955).
 
 
 38
 In light of the foregoing principles of law, we hold that the Board's finding that the Union did not bargain in bad faith is supported by substantial evidence. The Union offered many proposals in good faith. The fact that none of the Union's initial 16 proposals were contained in the final accord is not probative of bad faith because the proposals were only suggestions from the union membership. The Union, although not obligated to do so, offered counter-proposals on the helper issue, including its "targeted jobs proposal." The parties met eight times, and both sides made concessions regarding each other's proposals. The Union made a particularly important concession when it agreed to a wage freeze for its journeyman members.
 
 
 39
 The Union was clearly not comprised of saints, however. As Standard notes, Branca testified that some of the initial proposals were dropped when the parties got down to "serious bargaining." Branca stated that one of the Union's proposals was primarily advanced in order to examine the employers' books to check their financial condition. Branca Deposition Transcript at 191.
 
 
 40
 The Union was perhaps most unyielding in its approach to the helpers issue. Standard makes two contradictory arguments in contending that the Union's response constituted bad faith bargaining. Standard first argues that the Union failed to bargain seriously on the helper issue. Standard relies on a statement by the Union President, Frank Gruntowski, that it was under no obligation to respond to the Association's helper proposals because "its [sic] an employer proposal." Standard then argues that the Union in its "series of counterproposals" insisted on controlling the utilization of helpers. Standard here relies on N.L.R.B. v. Borg-Warner Corp., 356 U.S. 342 (1958) for the proposition that "insistence upon unilateral control over negotiable matters has been considered as evidence of bad faith."
 
 
 41
 Standard's reliance upon Borg-Warner is misplaced. The Supreme Court in Borg-Warner held that insistence upon inclusion of non-mandatory bargaining items was evidence of bad faith. Borg-Warner, 356 U.S. at 350. Insistence upon the inclusion of specific terms regarding mandatory bargaining terms is permissible under the Act. Ibid. Since Standard concedes that the helper issue is a mandatory subject of bargaining, Borg-Warner cannot help its cause.
 
 
 42
 Standard is essentially asking this court to provide it judicial relief from an agreement whose terms were less favorable than Standard had hoped. The negotiations with the Union were certainly not a model of friendship and cooperation, but the Act does not require the lion to lie down with the lamb. As we have noted before, "[n]othing in the labor law compels either party negotiating over mandatory subjects of collective bargaining to yield on its initial bargaining position...." Pease, 666 F.2d at 1050 (citation omitted). The Union could legitimately refuse to accept a proposal that it sincerely believed was unfair or that it had the bargaining strength to refuse. Kankakee-Iroquois County Employer's Ass'n v. N.L.R.B., 825 F.2d 1091 (7th Cir.1987). The Union could reasonably have concluded that the Association's helper proposals were unfair because union members would have been precluded from working. Given the pre-negotiation departure of Weathermark and Industrial First from the Association, the Union could also have legitimately concluded that the tables had turned in its favor, and used its muscle to force the Association into submission. This is "hard bargaining," N.L.R.B. v. Gibraltar Industries, Inc., 653 F.2d 1091, 1096 (6th Cir.1981), but it does not violate the Act.[1]
 
 
 43
 Standard's fourth argument is wholly without merit. Standard argues that Retail Associates, 120 N.L.R.B. at 393-94, permits untimely withdrawals when they are sincere and permanent, even if the withdrawal was not consented to and was not the product of "unusual circumstances." Noting that the Tenth Circuit in Tulsa Sheet Metal Works, Inc., 149 N.L.R.B. 1487, 1499 (1964), enforced, 367 F.2d 55 (10th Cir.1965), held that a determination that a withdrawal violated the Act must turn upon all "the attendant facts and circumstances," Standard argues that the facts and circumstances show that its withdrawal from the Association was sincere and permanent and thus not in violation of the Act.
 
 
 44
 Standard again misstates the law. The court in Tulsa Sheet Metal expressly reaffirmed the rule in Retail Associates that limits permissible untimely withdrawals to cases of consent or "unusual circumstances." It emphasized "attendant facts and circumstances" to determine when such consent or circumstances exist; it did not abrogate Retail Associates. Finally, Standard's contention that Retail Associates itself supports its argument is false. The pages of Retail Associates that Standard relies upon describe why timely withdrawals are permissible under the Act; they do not create a third exception justifying untimely withdrawals.
 
 C
 
 45
 In sum, Standard's contentions that the Board's order should not enforced because Standard's otherwise illegal withdrawal from a multi-employer bargaining group after the onset of bargaining with the union was justified by violations of the Act by the Union are without merit. We find that the Board's order is supported by both the Act and substantial evidence.
 
 III
 
 46
 Standard next contends that its untimely withdrawal does not constitute a violation of the Act because it, and the entire Association, was under no obligation to bargain with the Union after the expiration of the agreement on April 30 because of the Board's decision in John Deklewa & Sons, 282 N.L.R.B. 1375 (1987), enforced sub nom. International Association of Bridge, Structural & Ornamental Iron Workers, Local 3 v. N.L.R.B., 843 F.2d 770 (3d Cir.1988). The Board reversed itself in Deklewa, holding that construction industry Sec. 8(f) pre-hire agreements may not be repudiated unilaterally before expiration of the agreement, but are not transformed after their expiration into collective bargaining agreements. The Board applied Deklewa retroactively. Standard Roofing notes that the Association did not dissolve until after April 30, the expiration date of the previous agreement with the Union.
 
 
 47
 We agree with the Board that Standard is barred from making an argument based on Deklewa because this court has no jurisdiction to hear it. Section 10(e) of the Act reads "[n]o objection that has not been urged before the Board ... shall be considered by the court, unless failure or neglect to urge such objection shall be excused because of extraordinary circumstances." This circuit has enforced this statute strictly, holding that failure to present a question before the Board precludes our subsequent jurisdiction on appeal. Dist. 30, United Mine Workers of America v. N.L.R.B., 819 F.2d 651, 655 (6th Cir.1987).
 
 
 48
 Courts have rarely found such "extraordinary circumstances" which would justify an assertion of jurisdiction. The Supreme Court in Woelke & Romero Framing, Inc. v. N.L.R.B., 456 U.S. 645, 665-66 (1982) refused to hear an appeal on a question not presented before the Board even when the Board's own opinion raised the question itself. The Court held that even where the Board raises and solves a question upon its own initiative, the appellant must petition the Board for a reconsideration before the question becomes cognizable upon appeal.
 
 
 49
 Courts interpreting Sec. 10(e) have interpreted it strictly in other contexts as well. For example, courts have regularly held that failure to raise a question before the Board is not excused even when the Board changes its mind on the question during the course of the proceedings. United States v. L.A. Trucker Truck Lines, 344 U.S. 33, 36-37 n. 4 (1952); N.L.R.B. v. Newton-New Haven Co., 506 F.2d 1035, 1038 (2d Cir.1974); Howard Electric & Mechanical, Inc., 293 N.L.R.B. No. 51 (1989). Section 10(e)'s command cannot be abrogated even if the Board erred in applying its own precedent. Corson & Gruman Company v. N.L.R.B., 899 F.2d 47 (D.C. Cir.1990).
 
 
 50
 In light of the foregoing precedent, Standard's argument that it faced an "extraordinary circumstance" because the Board had never before applied Deklewa to multi-employer bargaining situations lacks persuasiveness. Standard could easily have raised this question before the Board, or even petitioned the Board for a re-hearing if it had not discovered the potential application of Deklewa to its own situation before the hearing.
 
 
 51
 We hold that the validity of the Board's order is not impaired by its failure to consider the ramifications of Deklewa for multi-employer bargaining situations.
 
 IV
 
 52
 Standard also disputes the nature of the remedy ordered by both the ALJ and the Board. The remedy requires Standard to adhere to the terms of the August 19 agreement and apply it retroactively to May 1, 1985, the day on which the Board alleges the agreement first took effect. We deal with a separate appeal regarding the appropriateness of requiring Standard to apply the agreement to the time from May 1, 1985 to August 19, 1985, the date when Standard alleges the agreement first took effect, in Part V of this opinion. Here we only consider whether Standard must adhere to the agreement and apply it from August 19, 1985 throughout its effective life.
 
 
 53
 Standard contends that adhering to an agreement signed after it was alleged to have violated the Act violates its due process rights. Standard relies upon our precedent in N.L.R.B. v. Homemaker Shops, 724 F.2d 535 (6th Cir.1984). In Homemaker Shops, this court held that a complaint by the NLRB must allege specifically what the General Counsel seeks to prove before the ALJ. Standard urges that the NLRB's complaint in this case also failed to notify it that the remedy of adhering to and applying retroactively the August 19 agreement would be litigated. The complaint at paragraph 9 alleged that Standard violated Secs. 8(a)(1) & (5) by withdrawing from the Association on June 19. Since the agreement was signed after the dissolution, Standard argues that no remedy can take account of any actions after the date of the violation, and that all evidence admitted regarding such post-June 19 actions can be used only for the limited purpose of evaluating Standard's defense that the Union negotiated in bad faith.
 
 
 54
 Standard completely misunderstands our holding in Homemaker Shops. Homemaker Shops deals only with violations, not with remedies. It is essential that parties know what they are being charged of in order to mount a capable and knowledgeable defense. Remedies for violations of the Act, however, need not be pled. See N.L.R.B. v. Winchester Electronics, Inc., 295 F.2d 288, 292 (2d Cir.1961) ("It is unnecessary for the complaint to spell out the details of the relief to be requested if it is found that the Act has been violated.") Accord, N.L.R.B. v. Schwab Foods, Inc., 858 F.2d 1285, 1294 (7th Cir.1988).
 
 
 55
 Standard's argument is also strange in light of the opening remarks before the ALJ. The crux of Homemaker Shops is notice: the complaint must place respondent on notice that it faces a particular charge. At the opening remarks, counsel for Standard specifically noted its contention above, that it was not required to defend against any violations of the Act subsequent to the June 19 dissolution, and thus no remedy could be levied which reflected actions taken after June 19. The counsel for the NLRB responded by specifically requesting the remedy issued by the ALJ and the Board:
 
 
 56
 It is my belief, and I'll be citing numerous cases in my brief, that the remedy for the violation alleged in the complaint is that Respondents are required to rejoin the multi-employer unit and ratify any actions that have been taken by that multi-employer group since the untimely withdrawal.
 
 
 57
 The ALJ indicated that he would be willing to consider that remedy if a violation was proven.
 
 
 58
 I don't anticipate that he's going to amend the complaint or try to go outside of these allegations. Are you Mr. Wilson? ... Now, the remedy is whole different ball game. I don't know that I necessarily, at this point, agree with the remedy that you indicated you'd be requesting ... I can't sit here now and skip over the complaint and talk about remedies.
 
 
 59
 We hold that Standard received notice of the potential remedy for violating the Act, and that the command of Homemaker Shops would have been complied with even if Standard's legal analysis had been correct. For all of the foregoing reasons, we hold that Standard must adhere to the August 19 agreement and apply its terms retroactively to August 19, 1985.
 
 V
 
 60
 * We must decide two additional issues raised by Standard on appeal. First, Standard contends that the Board-ordered bargaining unit[2] is inappropriate because failure to include helpers in the unit provides no guidance for awards of back pay and other benefits. Second, Standard contends that requiring it to apply the August 19 agreement retroactively to the first day after the expiration of the old agreement, May 1, 1985, is unjustified because no other signatory to the agreement applied it retroactively.
 
 
 61
 We affirm the Board's determination that the bargaining unit is appropriate, but we reverse the Board's order on the retroactivity of the August 19 agreement to May 1. We remand the retroactivity issue to the Board for further consideration and development of the record.
 
 B
 
 62
 The ALJ noted that the bargaining unit it ordered was "the same unit ... agreed upon in the expired contract and was also not the subject of any negotiations [between the Union and the Association].... [I]t was again approved in the new contract." ALJ Order at 8, n. 10. This observation does not respond to Standard's contention regarding the difficulty of awarding back-pay in the absence of a modified bargaining unit. However, Standard did not specifically discuss this difficulty before the ALJ, despite specifically denying the appropriateness of the bargaining unit in its answer. Since Standard provided no specific information to either the ALJ or the Board regarding why remedial awards would be difficult to calculate under the proposed bargaining unit, we do not find that the ALJ or the Board was obligated to consider the issue any further than they did.
 
 C
 
 63
 We are not persuaded by the Board's contention that Standard's appeal on the retroactivity issue is barred by Sec. 10(e). While it is true that a party must except from an ALJ's order with specificity in order to preserve an issue for review, N.L.R.B. v. Price's Pic-Pac Supermarkets, Inc., 707 F.2d 236, 241 (6th Cir.1983), we believe that Standard met its burden here. Standard did except to the Board's order of the remedy, and it specifically attacked the retroactive application of the agreement in its brief to the Board. "Next, with regard to modification, the fact that the agreement itself was not effective until August 19 makes clear that a remedy retroactive to May 1 is inappropriate." Respondent's Brief in Support of Exceptions at 47. Since the purpose for the specificity requirement is to "apprise the Board of an intention to bring up the question," N.L.R.B. v. Watson-Rummell Electrical Co., 815 F.2d 29, 31 (6th Cir.1987), quoting May Stores v. N.L.R.B., 326 U.S. 376, 386-87 n. 5 (1945), we believe that the Board was properly apprised of the details of Standard's argument by its inclusion in Standard's brief. See Bonanza Sirloin Pit, 275 N.L.R.B. 310 (1985) (Board suggests that exception may be general provided the brief contains a specific exception alleging what the error is).
 
 VI
 
 64
 For the foregoing reasons, we AFFIRM the Board's decision as regards Standard's first four appeals. We REVERSE and REMAND the Board's decisions on the retroactive application of the agreement to May 1, 1985. The Board on remand must provide us with sufficient findings and record to allow us to evaluate the Board's resolution of these issues.
 
 
 
 [1]
 Standard also contends that the Union's insistence that the reformed Association sign the Weathermark agreement without any changes is an illegal "take it or leave it" offer. This argument is wholly without merit because insistence upon an industry-wide agreement is a permissible goal in bargaining. Teamsters Local 301 (Merchants Moving and Storage, Inc.), 210 N.L.R.B. 783 (1974)
 
 
 [2]
 This units consists of "[a]ll working foremen, block floor men, journeymen and apprentices, excluding all office clerical employees and guards and supervisors as defined in the Act."